# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**Y.S.,**

Plaintiff,

v.

**JOHN DOE, et al.,**

Defendants.

Civil Action No. 1:25-cv-03129-DDD-KAS

---

**PLAINTIFF'S NARROWED RENEWED EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER DIRECTED TO NEST CLEARING AND CUSTODY LIMITED, TEMPORARY PRESERVATION AND ACCOUNT HOLD, EXPEDITED RESPONSE, PROMPT HEARING, AND AUTHORIZATION OF ALTERNATIVE SERVICE UNDER RULES 4(h)(2) AND 4(f)(3)**

---

Plaintiff Y.S., proceeding pro se, respectfully moves under Federal Rules of Civil Procedure 65, 4(h)(2), and 4(f)(3) for a narrowly tailored temporary restraining order directed to Nest Clearing and Custody Limited ("NCCL"), the Binance entity responsible for the custody of customer assets and maintenance of customer-account and ledger records, and for authorization of a defined method of alternative service and immediate notice. Binance's current Terms of Use identify NCCL as the custodian of customer digital assets, operator of the unified internal ledger, and entity responsible for clearing, settlement, credits, debits, and customer beneficial interests in omnibus wallets. Plaintiff does not seek an injunction against the unidentified Doe Defendants, the ███████ wallet as a whole, Binance's proprietary assets, or property belonging to unrelated customers.

This renewed motion answers the Court's three questions in ECF No. 147 as follows. First, NCCL is the proper Binance entity because Binance's current Terms identify NCCL as the

1

custodian of customer assets, operator of the internal ledger, and entity capable of identifying and restricting the customer account or accounts credited through the listed terminal outpoints.

Second, ███████ is a Binance-attributed operational or omnibus wallet, but Plaintiff does not seek to restrain that wallet. Instead, Plaintiff asks that NCCL use its internal ledger to identify the suspected scammers' customer account or accounts credited through the listed terminal outpoints and temporarily restrain withdrawals, transfers, conversions, or dissipation from those accounts, up to an aggregate value of $100,000.

Third, limited ex parte relief is necessary because advance notice to the affected customer could permit immediate withdrawal, conversion, or transfer before NCCL can implement the hold, while NCCL itself would receive immediate notice, an expedited opportunity to respond, and a prompt hearing.

Consistent with the Court's July 27, 2026 Order, ECF No. 147, Plaintiff therefore seeks a short, staged order that: (1) requires NCCL to preserve relevant account and ledger records; (2) temporarily prohibits withdrawals, transfers, conversions, or dissipation from only the customer account or accounts that NCCL's records identify as having been credited through the unique terminal outpoints listed in Plaintiff's de-duplicated schedule; (3) requires NCCL, consistent with ECF No. 83, to produce the authorized identifying information associated with those accounts; (4) caps the hold at $100,000; (5) temporarily prohibits notice to the affected customer or customers while NCCL is notified, served, and heard; (6) expressly authorizes, under Rules 4(h)(2) and 4(f)(3), a combined electronic method consisting of submission through Binance's centralized Third-Party Order portal, transmission to legal@binance.com, and transmission to Binance's known counsel, Mr. Jack Igoe, at jigoe@maglaw.com; (7) requires NCCL to respond within three business days; and (8) sets a prompt hearing.

**I. THE COURT'S JULY 27 ORDER AND THE PRECISE RELIEF NOW REQUESTED**

The Court denied Plaintiff's prior motion without prejudice because the requested injunction was "too broad and imprecise." ECF No. 147. The Court explained that it could not enjoin unknown persons, but that Plaintiff's request to enjoin third-party Binance "has more merit." Id. It invited a renewed motion explaining: "(1) why Binance is the proper party to enjoin; (2) the nature of the ▮▮▮▮▮▮ wallet and the assets to be enjoined; and (3) why the motion should be considered ex parte, that is without giving Binance a chance to respond." Id.

The renewed motion addresses those questions through the factual record and the narrowly defined relief set forth below.

## II. FACTUAL BACKGROUND

### A. Plaintiff's Coinbase transfers and requested $100,000 cap

Plaintiff alleges that anonymous fraud actors induced him to transmit approximately $100,000 in Bitcoin from his verified Coinbase account to the scam receiving address ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Coinbase records identify four outgoing transfers totaling approximately 0.883 BTC. The screenshots show outgoing dollar values of approximately $23,342.32 on September 2, $28,055.79 on September 8, and $49,551.92 on September 18, in addition to a smaller August transfer. ECF No. 21-1B. Plaintiff therefore requests a maximum restraint of $100,000, below the gross outgoing dollar value reflected in the Coinbase records, and only to the extent such value remains held for the internally credited account or accounts.

### B. Exact-source-outpoint tracing to ▮▮▮▮▮

Plaintiff's three tracing exhibits begin with the exact Coinbase source outpoints corresponding to his September 2, September 8, and September 18 transfers. ECF Nos. 143-1 through 143-3. They report reproducible transaction-graph paths from those exact outpoints, through recurring intermediate transactions, to Bitcoin address ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, publicly labeled ▮▮▮▮▮▮ Exhibit B

provides the public attribution of that address to ▮▮▮▮ and Exhibit C provides the de-duplicated schedule of terminal outpoints. The analyses expressly acknowledge that later transactions combine and divide funds, that reported routes may share segments and reconverge, and that public-chain analysis cannot determine the credited Binance customer, internal conversions, withdrawals, or remaining balance.

The routing history itself is relevant to urgency. The exhibits show repeated consolidation, division, reconvergence, and movement through approximately thirteen to sixteen stages before reaching Binance-facing terminal transactions. This is completed conduct, not a generalized observation that cryptocurrency is transferable. It demonstrates both the willingness and practical ability of the persons handling the proceeds to move value repeatedly and to place additional distance between Plaintiff's source outputs and the property's present form.

## C. De-duplicated terminal-outpoint schedule

To eliminate duplication and provide a finite set of search markers, Plaintiff extracted the terminal row from every reported path and de-duplicated the results by the unique terminal outpoint identifier TXID:VOUT. The resulting schedule contains thirty-two unique terminal outpoints to ▮▮▮▮ Each outpoint appears once, while the schedule identifies all connected Plaintiff source transfers and supporting exhibit/path references (Ex. C). The full value of each terminal output is not asserted to be Plaintiff's property and is not added together. The schedule exists solely to permit NCCL to match the unique on-chain deposits to its internal ledger.

## D. Binance's own publication, public attribution, substantial balance, and continuing activity of ▮▮▮▮

The attribution of the target address to Binance does not depend solely on a third-party explorer label (Ex. B). On Binance's official "Our Commitment to Transparency" webpage, Binance stated that it was publicly sharing details of its hot and cold wallet addresses and included the exact Bitcoin address ▮▮▮▮▮▮▮▮▮▮▮▮ in its

4

disclosed wallet list (Ex. E). The page identifies the information as a November 10, 2022 snapshot. This constitutes direct, first-party evidence that the address formed part of Binance's wallet infrastructure. It does not, standing alone, identify the customer account credited through any particular deposit or establish that Plaintiff's funds remain in the wallet; those matters can be determined only through NCCL's internal ledger.

A public Blockchain.com address page identifies the exact target address, ███████████████████████████████████████, as ██████████ and reflects exceptionally high transaction volume and continuing activity (Ex. B). As of July 28, 2026, the page reported a wallet balance valued at approximately $618,168,960. Because both Bitcoin prices and wallet balances fluctuate continuously, Plaintiff relies on that figure only as a dated snapshot demonstrating the wallet's substantial size and operational character, not as evidence that the entire balance belongs to any Defendant or that Plaintiff's property remains identifiable within the wallet in that amount.

Plaintiff relies on the public ██████████ label as attribution evidence, not as conclusive proof of legal ownership or customer-level entitlement. The address's size, transaction volume, and continuing activity are consistent with a large operational or omnibus wallet used to receive, aggregate, and transfer assets associated with numerous customers or transactions. Binance's own Terms explain that customer digital assets may be held on-chain in one or more omnibus wallets while individual customer entitlements and beneficial interests are recorded separately on NCCL's internal ledger. Ex. A, Terms §§ 8.1–8.4.

Accordingly, Plaintiff does not seek to freeze ██████████ restrain its approximately $618 million reported balance, or interfere with assets belonging to NCCL, Binance affiliates, or unrelated customers. Plaintiff seeks only a temporary account-level restriction, implemented through NCCL's internal ledger, of no more than $100,000 in assets or ledger value attributable to the customer account or accounts credited through the thirty-two identified terminal

TXID:VOUT markers. The public wallet balance is relevant only to explain the nature of

███████ and why the requested relief must operate at the customer-ledger level rather than

against the omnibus wallet itself.

### E.  BHL identified the current ADGM Binance entities

BHL's counsel confirmed actual receipt of Plaintiff's earlier subpoena and related filings,

stated that BHL did not possess or control the requested information, and identified Nest

Exchange Limited, Nest Clearing and Custody Limited, and Nest Trading Limited as the relevant

ADGM Binance entities (ECF No. 112-1). Binance's Terms effective July 21, 2026 specify the

operational roles of those entities and establish that NCCL is the custodian and internal-ledger

operator. Ex. A.

### III. DIRECT ANSWERS TO ECF NO. 147

### A.  NCCL is the proper Binance entity because it has functional possession and control of the relevant customer-level assets and ledger

Binance's Terms define Nest Exchange Limited, NCCL, and Nest Trading Limited

collectively as the "ADGM Binance Entities," each performing a distinct function through a

unified Binance account. Nest Exchange Limited operates the trading venue. Nest Trading

Limited provides broker-dealer and related services. NCCL provides clearing, settlement,

custody, and lending services; holds customer assets as custodian; and operates the unified

account structure. Ex. A at 1-4.

The Terms provide that: (1) a customer appoints NCCL as custodian of all digital assets,

securities, and currency transferred to or received for the Binance account; (2) NCCL maintains

the customer's Custody Record and Internal Ledger; (3) NCCL credits and debits Binance

accounts and effects settlement; (4) NCCL records each customer's individual entitlement and

beneficial interest; (5) NCCL can transfer assets between subaccounts or to external addresses;

and (6) NCCL maintains settlement records identifying amounts, dates, times, and accounts credited and debited. Ex. A, Terms §§ 1.1, 8.1-8.4, 9.1-9.2, 9.11, 12.2.

The Terms also state that rights, positions, assets, and transaction history were transferred to and recognized by the relevant ADGM Binance entities through the unified account structure operated by NCCL after the January 2026 novation. Ex. A at 3. Thus, although some terminal transactions occurred in January 2026 and the current Terms became effective July 21, 2026, Binance's own current contract identifies NCCL as the entity now maintaining the custody and ledger relationship.

The requested order therefore does not rely on alter ego, veil piercing, or the proposition that BHL owns every record. It relies on NCCL's expressly stated functional possession and control of the specific property interest at issue. NCCL is the entity capable of matching the listed terminal TXID:VOUT markers to internal customer credits and preventing withdrawal or transfer during the short period before it is heard.

Binance's public legal-request channel independently confirms Binance's established process for reviewing civil account-restriction orders, while Binance's Terms identify NCCL's regulated custody role. The channel expressly accepts "Third-Party Orders" seeking disclosure of account information or restrictions on Binance user accounts. It requires a court order from a competent jurisdiction that states the precise request and warns that requests broader than the order will not be entertained. Separately, Binance's Terms identify NCCL as the ADGM entity recognized to provide custody and operate a central securities depository. Ex. A. Although the portal expressly reserves all service, jurisdictional, and substantive objections and does not itself constitute formal service, it confirms that Binance has an operational mechanism for receiving, reviewing, and, where legally appropriate, implementing precisely worded account restrictions. Ex. F. The portal is a centralized Binance channel, not an NCCL-specific service portal; its

relevance is that it routes precisely worded court orders to the appropriate Binance legal-review function and entity.

**B.** ▮▮▮▮▮▮ **is consistent with an omnibus wallet; the assets sought are customer-level ledger interests, not the wallet**

Binance's Terms explain the distinction that was missing from Plaintiff's prior request. NCCL may hold customer digital assets on-chain in omnibus wallets together with assets held for other customers, Binance affiliates, and NCCL itself. Ex. A, Terms § 8.4.1(c). Customers do not necessarily own specific coins or outputs. Instead, each customer has an individual beneficial interest in a quantity and type of digital asset recorded in the customer's Binance account and NCCL's Internal Ledger. Id. §§ 8.2, 8.4.1(a)–(c).

Accordingly, Plaintiff does not ask the Court to freeze ▮▮▮▮▮▮ seize particular satoshis, or restrain the full output values listed in the terminal schedule. First, NCCL would identify the suspect customer account or accounts credited through the thirty-two listed terminal TXID:VOUT markers. Second, NCCL would temporarily restrain withdrawals, transfers, conversions, or dissipation from those accounts, up to an aggregate value of $100,000. The hold would include Bitcoin, other digital assets, currency, ledger credits, and internally converted or substituted value only insofar as NCCL's records attribute that value to the credited account or accounts. It would exclude NCCL's proprietary property and assets beneficially owned by unrelated customers.

A schematic illustrating the flow from Plaintiff's Coinbase account through the scammers, the on-chain transactions, and ▮▮▮▮▮▮ to the suspect internal customer account or accounts, and identifying the property subject to restraint, is attached as Exhibit G.

This relief is objectively administrable and specific. See Fed. R. Civ. P. 65(d)(1); *M.G. v. Armijo*, 117 F.4th 1230, 1260–61 (10th Cir. 2024). NCCL would need to answer a finite

8

operational question: which account or accounts were credited through the listed terminal outpoints, and does NCCL currently hold up to $100,000 for those accounts?

Consistent with ECF No. 83, once NCCL identifies those accounts, Plaintiff also requests production of the names, physical addresses, telephone numbers, email addresses, and IP-address information associated with them. This request implements the early discovery already authorized by the Court and does not seek discovery beyond ECF No. 83.

## C.  The ex parte component is limited to preventing customer flight before NCCL can respond

Plaintiff does not request that NCCL be deprived of a meaningful opportunity to be heard. He requests a staged process. The initial order would last only long enough to preserve the status quo, prevent customer notification and withdrawal, serve NCCL, obtain a response within three business days, and conduct a prompt hearing. Any continuation would occur only after NCCL has been heard.

Advance notice creates a concrete risk because the relevant property is digital, globally transferable, and controlled through account instructions that can be executed quickly. The Doe actors used pseudonymous identities, layered transactions, and repeated transfers to conceal ownership. The tracing evidence shows completed multi-stage movement before the deposits into ▮▮▮▮▮▮ Once the affected account holder learns that a restraint is being sought, that person could instruct NCCL to withdraw, convert, or transfer the account balance before the Court can act. An order served on NCCL without a temporary non-notification provision could itself alert the customer and defeat the requested relief.

The requested ex parte component is therefore not based on distrust of NCCL. It is based on the risk that notice reaching the credited customer before a short hold is implemented would permit immediate dissipation. Plaintiff proposes that NCCL receive immediate notice of the order and motion, be permitted to seek modification at once, respond within three business days,

and appear at a prompt hearing. The customer—not NCCL—would be temporarily denied advance notice, only for the limited period necessary to preserve the Court's ability to adjudicate the request.

The proposed procedure also tracks Binance's own published requirements. Upon entry, Plaintiff will immediately upload the signed motion and order through Binance's centralized Third-Party Order portal for court orders concerning account information or account restrictions and will simultaneously transmit copies to legal@binance.com and known Binance counsel. The portal expressly disclaims status as formal service. The Magistrate Judge also concluded that Plaintiff's prior transmission to legal@binance.com did not constitute valid service, and Plaintiff has filed an objection to that determination, which remains pending. Plaintiff does not rely on the prior transmission as independently establishing valid service in this motion. Instead, he requests that the Court expressly authorize the combined portal, email, and counsel method under Rules 4(h)(2) and 4(f)(3). Unless and until the Court grants that authorization, the proposed transmissions are relied upon only as redundant means reasonably calculated to provide NCCL and Binance's legal-review function with prompt actual notice. Only advance notice to the affected customer would be temporarily withheld to prevent frustration of the requested restraint.

**D. The Court should authorize a precise method of alternative service and immediate notice on NCCL**

NCCL is a foreign corporation located in the United Arab Emirates. Rule 4(h)(2) permits service on a foreign corporation at a place outside the United States in any manner prescribed by Rule 4(f), except personal delivery under Rule 4(f)(2)(C)(i). Rule 4(f)(3), in turn, permits service "by other means not prohibited by international agreement, as the court orders." The Magistrate Judge previously concluded that Plaintiff's transmission of Binance-directed papers to legal@binance.com was insufficient to establish valid service. Plaintiff has objected to that determination, and the objection remains pending. Without waiving or abandoning that

objection, Plaintiff requests express authorization under Rules 4(h)(2) and 4(f)(3) for the combined method proposed here, rather than relying on the prior email transmission as already sufficient.

The United Arab Emirates is not listed as a contracting party to the Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "1965 Hague Service Convention"). See Hague Conference on Private International Law, Status Table, Convention No. 14 (last accessed July 28, 2026), https://www.hcch.net/en/instruments/conventions/status-table/?cid=17. The Convention therefore does not prescribe a mandatory or exclusive method for transmitting judicial papers to NCCL in the UAE. Its inapplicability does not, by itself, validate any particular method of service; the requested methods must still be authorized by the Court, not prohibited by another international agreement, and reasonably calculated to provide actual notice and an opportunity to respond.

Plaintiff proposes three coordinated methods reasonably calculated to provide prompt actual notice: (1) upload of the signed motion, order, and supporting materials through Binance's centralized Third-Party Order portal for court orders concerning account information or account restrictions; (2) email transmission to legal@binance.com; and (3) email transmission to BHL counsel who previously confirmed actual receipt of Plaintiff's Binance-directed subpoena and related filings (ECF No. 112-1). These electronic methods provide immediate notice to Binance's legal-review function through multiple established channels.

The requested authorization does not treat portal submission alone, or transmission to legal@binance.com alone, as independently sufficient service. Nor does it ask Binance to waive any jurisdictional objection or rely on the portal's availability as consent to jurisdiction. Instead, Plaintiff asks the Court to authorize a combined and redundant electronic method using Binance's centralized Third-Party Order portal, legal@binance.com, and counsel with a demonstrated history of actual receipt. This request is made without prejudice to Plaintiff's

pending objection concerning the validity of his prior service efforts. Plaintiff requests that service be deemed complete only upon completion of the combined transmissions expressly authorized by the Court, in the manner the Court directs, and that Plaintiff thereafter file a separate Notice and Certificate of Service identifying the date, time, portal confirmation, and email recipients.

## IV. NORTHFIELD PROVIDES CLOSELY ANALOGOUS, PERSUASIVE SUPPORT

In *Northfield LLC v. Onchainweb3*, No. 1:26-cv-00092-MJT, Dkt. 3 (E.D. Tex. Mar. 12, 2026), the court granted an ex parte temporary restraining order in a pig-butchering cryptocurrency case after tracing identified specific Binance and other exchange addresses associated with the alleged theft. The court found that the "instantaneous and opaque nature of cryptocurrency transactions," combined with the defendants' conduct, made recovery unlikely unless they were precluded from withdrawing or transferring the contents of their accounts. Id. at 5. It further found that temporarily maintaining assets at destination accounts imposed substantially less harm than allowing alleged stolen property to be moved beyond recovery. Id. at 5-6.

Northfield also recognized that an asset freeze in the form of a constructive trust over specific, traceable stolen assets is a form of relief commonly granted in cryptocurrency-fraud cases. Id. at 5 n.3. The court found that the public interest favored an order promoting recovery of stolen assets located and traced to specific destinations. Id. at 6. It imposed no bond. Id. at 10.

The Northfield court later entered a preliminary injunction after notice. *Northfield LLC v. Onchainweb3*, No. 1:26-cv-00092-MJT, Dkt. 10 (E.D. Tex. Apr. 30, 2026). The preliminary-injunction order confirms that a short ex parte freeze can be followed by adversarial review and continued only after notice. That staged sequence is the model Plaintiff requests here.

Northfield is persuasive, not controlling, and the factual records are not identical. Northfield involved exchange accounts or deposit addresses identified by a professional investigator. Here, the public tracing terminates at a large Binance-labeled Bitcoin wallet and NCCL's internal ledger is required to identify the credited account. Plaintiff acknowledges that distinction. It strengthens—not weakens—the need to direct the order narrowly to NCCL's internal account-level attribution rather than to the wallet as a whole.

## V. RULE 65(b) CERTIFICATION AND VERIFIED FACTS

Plaintiff certifies under Rule 65(b)(1)(B) that he has not provided advance notice of this renewed request to the Doe Defendants because their names, locations, and reliable service addresses remain unknown. Plaintiff has not provided advance notice to NCCL before filing because the requested temporary no-customer-notice provision could be defeated if the affected customer learned of the request before NCCL implemented the hold. Plaintiff previously transmitted Binance-directed papers to legal@binance.com and Binance's known counsel, and counsel confirmed actual receipt. The Magistrate Judge later concluded that the prior transmission did not constitute valid service, and Plaintiff's objection to that determination remains pending. Plaintiff does not rely on the prior transmission as independently establishing service for this motion. He requests that, immediately upon entry, the Court expressly authorize service and notice on NCCL under Rules 4(h)(2) and 4(f)(3) through the combined Binance portal, email, and counsel methods described above.

Plaintiff concurrently submits the separate Declaration of Y.S. under 28 U.S.C. § 1746, setting forth facts within his personal knowledge concerning his Coinbase transfers, the fraud, his inability to recover the funds, and his efforts to identify and preserve the property. The tracing exhibits disclose their source outpoints, path results, limitations, and terminal markers. The Court therefore has verified factual material addressing immediate and irreparable injury, as Rule 65(b)(1)(A) requires.

## VI. LEGAL STANDARD

A temporary restraining order is governed by the same substantive four-factor test as a preliminary injunction. A movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm absent relief; (3) that the threatened injury outweighs the harm caused by the injunction; and (4) that the injunction will not adversely affect the public interest. *Leachco, Inc. v. Consumer Product Safety Commission*, 103 F.4th 748, 755 (10th Cir. 2024); *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Preliminary relief is extraordinary, and the right to relief must be clear and unequivocal. Leachco, 103 F.4th at 755.

Rule 65(b)(1) permits a temporary restraining order without notice only when specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury will occur before the adverse party can be heard and the movant certifies in writing the efforts made to provide notice and the reasons notice should not be required. Any order must state its terms specifically and describe in reasonable detail the acts restrained. Fed. R. Civ. P. 65(b), (d).

Rule 4(h)(2) governs service on a corporation at a place outside any judicial district of the United States and incorporates the methods in Rule 4(f), except personal delivery under Rule 4(f)(2)(C)(i). Rule 4(f)(3) authorizes service by other means not prohibited by international agreement, as the court orders. Because the UAE is not a contracting party to the 1965 Hague Service Convention, that Convention does not impose a mandatory channel for service on NCCL in Abu Dhabi. A court-authorized method must nevertheless be reasonably calculated, under the circumstances, to apprise the recipient of the proceeding and afford an opportunity to respond. Plaintiff requests a redundant combination of electronic presentation, email notice, and notice through counsel with a demonstrated receipt history.

14

## VII. THE RULE 65 FACTORS FAVOR THE NARROW TEMPORARY RELIEF

### A. Substantial likelihood of success on claims seeking specific equitable property relief

Plaintiff alleges that the Doe Defendants obtained his Bitcoin through fraudulent misrepresentations and wrongfully retained and transferred the proceeds. The Coinbase records establish Plaintiff's ownership of and transfer from the source account. The exact-source-outpoint tracing connects three source outputs to a finite set of Binance-facing terminal outpoints. Ex. C. Binance's Terms establish that NCCL records customer beneficial interests and can identify the account credited through a deposit even when assets are commingled in an omnibus wallet. Ex. A.

Plaintiff seeks constructive trust, equitable lien, restitution of specific property, and recovery of traceable substitutions and proceeds—not security for a general unsecured money judgment. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc*., 527 U.S. 308, 333 (1999), limits prejudgment restraints where a plaintiff seeks only money damages and claims no lien or equitable interest. It does not eliminate the traditional power to preserve specifically claimed property or a fund that is the subject of equitable relief. See *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 289-90 (1940). Northfield likewise treated a constructive trust over specific, traceable stolen crypto assets as an appropriate basis for temporary account restraint.

The proposed order fits that distinction. It does not restrain all assets of any Doe Defendant or NCCL. It preserves only the customer-level interest that NCCL's records associate with the listed deposits, capped at $100,000 and subject to immediate adversarial review.

### B. Immediate and irreparable harm

The injury is not merely that a future damages judgment may be difficult to collect. The requested relief concerns allegedly stolen digital property and its traceable substitutions, which can be transferred beyond the Court's practical reach in minutes. The Doe actors have already concealed their identities and moved the Bitcoin through layered transactions. After deposit into

15

███████ only NCCL's private ledger can identify the credited customer and current disposition.

If the credited customer withdraws the balance to a self-custodied wallet or another noncompliant platform before NCCL identifies and preserves it, the specific property interest underlying Plaintiff's equitable claims may disappear. No later damages award can restore the Court's present ability to preserve and adjudicate that property. ECF No. 147 itself recognized that a temporary restraining order "may be useful and necessary for ensuring ultimate relief is available." Northfield similarly found recovery unlikely absent a freeze because of the instantaneous and opaque nature of crypto transfers.

## C. Balance of harms

The requested order imposes limited burdens on NCCL. It requires NCCL to use thirty-two exact outpoint identifiers to locate corresponding internal credits, preserve records, and place a temporary hold of no more than $100,000 on the credited account or accounts. NCCL would not surrender assets, adjudicate ownership, disclose unrelated customer data, or freeze ███████ It would receive immediate notice, an expedited opportunity to respond, and a prompt hearing.

By contrast, denying a brief hold may permit permanent dissipation of the only identifiable property connected to Plaintiff's equitable claims. As Northfield reasoned, the temporary inability to move disputed assets causes substantially less harm than allowing alleged stolen property to be placed beyond recovery.

## D. Public interest

The public has an interest in preventing fraud, preserving potentially stolen property, enforcing court orders, and ensuring meaningful final relief. It also has an interest in protecting innocent exchange customers and respecting due process. The proposed order serves both interests because it is transaction-specific, account-level, capped, temporary, confidential, and

16

followed by immediate adversarial review. Northfield likewise found that a tailored freeze serves

the public interest by supporting recovery of stolen assets traced to identifiable destinations.

## VIII. THE REQUESTED ORDER

Plaintiff requests a temporary restraining order providing:

1. NCCL shall immediately preserve all records concerning the thirty-two unique terminal TXID:VOUT markers listed in Exhibit C, including the internal account or accounts credited, ledger entries, subsequent internal transfers, conversions, withdrawals, and current balances.

2. NCCL shall identify the customer account or accounts internally credited through those terminal outpoints and temporarily prohibit withdrawals, external transfers, internal transfers to other users, conversion intended to facilitate withdrawal, dissipation, or closure from those accounts, but only up to an aggregate value of $100,000.

3. Consistent with the early discovery already authorized at ECF No. 83, NCCL shall produce the names, physical addresses, telephone numbers, email addresses, and IP-address information associated with the customer account or accounts identified as having been credited through the thirty-two listed terminal TXID:VOUT markers. This provision does not authorize discovery beyond the scope of ECF No. 83.

4. The hold shall apply only to assets, currency, ledger credits, converted proceeds, or substituted value presently held or recorded by NCCL for the credited account or accounts. It shall not apply to NCCL's proprietary assets or assets beneficially owned by unrelated customers.

5. NCCL shall not be required to treat the full terminal-output amounts as Plaintiff's property, trace particular satoshis after commingling, or restrain the ▮▮▮▮▮▮ wallet itself.

6. For seven days, or until further order of the Court, NCCL shall not notify the affected customer or customers of this motion, the Court's order, the identification of the account or accounts, or the temporary hold, except that NCCL may disclose the matter to its counsel, regulators, compliance personnel, and persons reasonably necessary to implement or challenge the order.

7. Under Rules 4(h)(2) and 4(f)(3), and without prejudice to Plaintiff's pending objection concerning the Magistrate Judge's determination regarding his prior service efforts, Plaintiff is expressly authorized to serve and provide immediate notice to NCCL by the following combined methods: (a) uploading the signed motion, order, and supporting materials through Binance's centralized Third-Party Order portal for court orders concerning account information or account restrictions; (b) emailing the same materials to legal@binance.com; and (c) emailing them to BHL counsel who previously confirmed actual receipt of Binance-directed papers. Neither portal submission nor transmission to legal@binance.com is treated as independently sufficient service absent the Court's authorization. The centralized Binance portal is not represented as NCCL's own portal, and the combined method does not constitute consent to jurisdiction or waiver of any objection.

8. Service shall be deemed complete only upon completion of all Court-authorized electronic transmissions in the manner directed by the Court. Plaintiff shall promptly file a separate Notice and Certificate of Service stating the date and time of each transmission, the portal confirmation or reference number, and the email recipients.

9. NCCL may seek modification or dissolution immediately and shall file any response within three business days after receiving the order.

10. The Court shall set a prompt hearing at the earliest practicable time.

11. The order shall expire fourteen days after entry unless extended under Rule 65(b)(2) or replaced after notice and hearing.

12. Any account-identifying response may be filed under Level 1 restriction or submitted for in-camera review to protect personal and unrelated customer information.

13. The order shall state with precision that NCCL need only identify and restrict the account or accounts internally credited through the thirty-two listed terminal TXID:VOUT markers, up to an aggregate value of $100,000, because Binance's published Third-Party Order procedures require the requested restriction to be no broader than the court order obtained.

## IX. SECURITY UNDER RULE 65(c)

Plaintiff is proceeding pro se. The proposed order preserves existing assets, does not transfer possession to Plaintiff, does not restrain unrelated customer property, and gives NCCL an immediate opportunity to seek modification. Northfield imposed no bond in materially analogous circumstances. Plaintiff therefore requests that the Court waive security or require only a nominal bond. Alternatively, Plaintiff requests that the Court set security in an amount it finds appropriate after considering the narrow duration and limited burden of the requested hold.

## X. CONCLUSION

ECF No. 147 recognized that temporary relief may be useful and necessary but required a narrower and more precise request. This motion supplies that precision. It identifies NCCL as the Binance custodian with functional control over the unified ledger and customer assets; defines ███████ as consistent with an omnibus or operational wallet whose customer entitlements exist on NCCL's internal ledger; limits the property to the customer-level interest linked to thirty-two unique terminal outpoints; caps the hold at $100,000; excludes unrelated assets; provides NCCL immediate notice, expedited briefing, and a prompt hearing; and requests a defined, redundant

19

method of alternative service under Rules 4(h)(2) and 4(f)(3). Plaintiff respectfully requests entry

of the narrowly tailored temporary restraining order and service authorization described above.


Respectfully submitted,


/Y.S./
Y.S., Pro Se

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

I hereby certify that the foregoing motion contains 5,389 words and complies with the 5,500-word limitation set forth in DDD Civ. P.S. III(A)(2).


Dated: July 29, 2026.



Y.S.
Plaintiff, Pro Se

21

**CERTIFICATE OF SUBMISSION**

I certify that on July 29, 2026, I submitted the foregoing Plaintiff's Narrowed Renewed Emergency Motion for Temporary Restraining Order Directed to Nest Clearing and Custody Limited, Temporary Preservation and Account Hold, Expedited Response, Prompt Hearing, and Authorization of Alternative Service Under Rules 4(h)(2) and 4(f)(3) to the Clerk of Court for filing by email.


/s/ Y.S.
Y.S.
Plaintiff, Pro Se